Lucille Ware Magouirk
MITCHELL, Plaintiff,

v.

RANDOM HOUSE, INC., Lucy de
Barbin and Dary Matera,
Defendants.

Civ. A. No. J87–0473(L).

United States District Court,
S.D. Mississippi,
Jackson Division.

May 25, 1988.

Sam E. Scott, Heidelberg, Woodliff & Franks, Jackson, Miss., Mary F. Gibbons, Beverly Hills, Cal., for Lucille Ware Magouirk Mitchell.

John C. Henegan, R. Andrew Taggart, W. Wayne Drinkwater, Jr., Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., for Random House, Inc., Lucy de Barbin and Dary Matera.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendants Lucy de Barbin and Dary Matera to dismiss for lack of personal jurisdiction and the separate motion of all defendants to dismiss for failure to state a claim upon which relief may be granted.[1] Plaintiff Lucille Ware Magouirk Mitchell timely responded to the motion and the court has considered the memoranda of authorities together with attachments submitted by the parties.

This action arises out of the publication by defendant Random House, Inc., acting through its Villard Books Division, of a book entitled *Are You Lonesome Tonight?: The Untold Story of Elvis Presley's One True Love—And The Child He Never Knew* (Book). The Book, which was co-authored by Lucy de Barbin and Dary Matera, purports to trace a romantic relationship—the "tragic and touching love story"—between Lucy de Barbin and Elvis Presley until his death. On the basis of various statements contained in chapter one of the Book, Mitchell brought this action asserting claims for relief for defamation or libel, invasion of privacy, and intentional and/or negligent infliction of mental and emotional distress. She seeks a permanent injunction prohibiting defendants from continuing publication of the statements, an order directing that defendants retract all false statements concerning her and her family, and compensatory and punitive damages.[2]

---

1. The motion was joined in by defendants Lucy de Barbin and Dary Matera as an alternative to their motion to dismiss for lack of personal jurisdiction.

2. Defendants note in their motion to dismiss that they will assume for purposes of the motion that Mississippi law applies to plaintiff's complaint in view of the fact that plaintiff alleges that her claims arose in Mississippi out of the publication of a book here. Defendants express, however, "[serious] doubts" that the law of Mississippi is applicable to plaintiff's claims inasmuch as she is a citizen of Louisiana. Yet they have chosen not to pursue this conflicts of law issue unless and until it becomes necessary. The parties, including plaintiff, have proceeded on this motion to dismiss as though Mississippi provides the applicable law; plaintiff has chosen to proceed in this forum and has not raised the issue of the applicability of another state's laws, and defendant has opted to proceed with this motion on the basis of Mississippi law.

Which state's laws would be applicable in the absence of such an implicit agreement by the parties, that of Louisiana or that of Mississippi, is not altogether clear, though based on the information available, Louisiana may well have the greater interest by virtue of the fact that plaintiff is a resident of Louisiana. *See Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072, 1077 (3rd Cir.1985) (any harm to reputation of defamation plaintiff occurred in his home state of Pennsylvania and Pennsylvania therefore provided applicable rule

Jurisdiction in this cause is predicated upon diversity of citizenship. *See* 28 U.S.C. § 1332 (Supp.1987). Plaintiff, a Louisiana resident, has sued Random House, a New York corporation, and de Barbin and Matera, Texas and Florida citizens, respectively. Plaintiff alleges that defendants de Barbin and Matera are subject to this court's jurisdiction under the Mississippi Long–Arm Statute, Miss.Code Ann. § 13–3–57 (Supp.1937),[3] since they, by causing publication of the Book in Mississippi, have committed a tort in whole or in part in Mississippi. The individual defendants, however, object to this court's exercise of *in personam* jurisdiction stating that they have not committed a tort within the State of Mississippi and have not otherwise had any contact with this state.

The familiar two-step jurisdictional analysis requires that the court consider first, whether state law provides for the assertion of such jurisdiction, *i.e.*, whether the requirements of the long-arm statute are satisfied, and second, whether the exercise of jurisdiction comports with the dictates of the fourteenth amendment due process clause. *See Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162 (5th Cir.1985) (citing *Smith v. DeWalt Products Corp.*, 743 F.2d 277 (5th Cir.1984)).

■ de Barbin and Matera claim that they did not publish the Book in Mississippi, and instead were simply independent contractors with respect to their authorship of the Book; Random House actually published the Book. It purchased from de Barbin and Matera all rights to the Book, including the right to exclusive control over publication and distribution. In the court's opinion, defendants' contention that they did not publish the Book in Mississippi is based on an incorrect premise. While the individual defendants did not "publish" the Book in the sense that they did not actually print the written material for distribution, they did publish the Book and the alleged defamatory matter in the legal sense. Under the law of defamation, the term "publication" is a term of art signifying the communication of libelous matter to a third person. Further, under the law of defamation, the original publisher of a libel is liable to respond in damages for each republication of the statements by another. As the Mississippi Supreme Court explained in *Newson v. Henry*, 443 So.2d 817 (Miss.1983), the author of the defamation is liable for any secondary publication which is a natural consequence of the author's original action. In the case at bar, defendants de Barbin and Matera are the actual writers of the Book who "published" or "communicated" the writing to Random House which, in turn, and as a natural consequence of the actions of de Barbin and Matera, republished the Book on a widespread basis. *See Restatement (Second) of Torts* § 577(f) (1977) (one is liable for publication of defamation by third person whom he directs or procures to publish defamatory matter).

A cause of action for defamation does not exist in the absence of communication or "publication" of defamatory statements to a third person, *i.e.*, to one other than the plaintiff. There is no contention by these defendants that the Book was not published and distributed in Mississippi, though they claim that the publication and distribution were effected exclusively by Random House. Nevertheless, the republication by Random House amounted to a secondary

of law); *Hanley v. Tribune Publishing Co.*, 527 F.2d 68 (9th Cir.1975) (in defamation cases choice of law factors normally call for application of law of plaintiff's domicile). However, a review of pertinent Louisiana jurisprudence reveals no conflict with Mississippi law that would operate to change the result which the court reaches on the motion.

**3.** Section 13–3–57 provides, in pertinent part, that
 [a]ny nonresident person ... who shall commit a tort in whole or in part in this state against a resident or nonresident of this state ... shall be deemed to be doing business in Mississippi. Such act or acts shall be deemed equivalent to the appointment by such nonresident of the secretary of state of the State of Mississippi ... to be the true and lawful attorney or agent of such nonresident upon whom all lawful process may be served in actions or proceedings accrued or accruing from such act or acts, or arising from or growing out of such ... or tort, as an incident thereto, by such nonresident....

publication of the Book for which the authors, de Barbin and Matera, could be subjected to liability. Hence, in the court's opinion, a tort was committed, at least "in part," in Mississippi by the "publication" of the Book in this state. Thus the requirements of the long-arm statute are satisfied.

 In addition to their claim that the individual defendants were not responsible for the commission of a tort in the State of Mississippi, de Barbin and Matera take the position that assertion of personal jurisdiction over them in this case would violate due process considerations. They urge that they did not control the activities of Random House and were not responsible for its distribution of the Book in Mississippi. Further, they contend that inasmuch as plaintiff is a nonresident of Mississippi, they could not have foreseen any injury to her in Mississippi and that other than their indirect participation in the publication of the Book by selling their rights to the Book to Random House, they have absolutely no contact with the State of Mississippi. Since the injury sought to be redressed by a claim of defamation is injury to one's reputation, de Barbin and Matera argue that the brunt of any harm suffered by plaintiff, a Louisiana resident, both in terms of emotional distress and injury to her reputation, was sustained in Louisiana, not Mississippi, and that there exist no circumstances under which they might have "reasonably anticipate[d] being haled into court" in Mississippi to answer for the truth of the statements in the Book. *See Worldwide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). It is clearly these defendants' position that the only forum in which a defamation plaintiff may bring an action is in the state of his or her residence since it is only that state in which plaintiff enjoys a reputation which could be diminished by a false and defamatory publication. This position was expressly rejected by the United States Supreme Court in *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), a case in which the plaintiff, a New York resident, brought a libel action against an Ohio based magazine publisher.

It is undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire. But that will be true in almost every libel action brought somewhere other than the plaintiff's domicile. *There is no justification for restricting libel actions to the plaintiff's home forum. The victim of a libel, like the victim of any other tort, may choose to bring suit in any forum with which the defendant has "certain minimum contacts ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' Milliken v. Meyer,* 311 U.S. 457, 463 [61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)] ..." *International Shoe Co. v. Washington,* 326 U.S., [310] at 316, 66 S.Ct., [154] at 158, 90 L.Ed. 95 [1945].

*Keeton,* 465 U.S. at 780–81, 104 S.Ct. at 1481–82 (emphasis added). In *Keeton,* the court concluded that the defendant magazine was subject to jurisdiction in New Hampshire since the magazine was a nationwide publication aimed at a nationwide audience which sold and distributed a substantial number of copies in New Hampshire. *Id.* at 781, 104 S.Ct. at 1481.

There is nothing in the case at bar to indicate that de Barbin and Matera have "systematic and continuous" contact with Mississippi such as would support the exercise of *in personam* jurisdiction over them in a suit not arising out of their contacts with Mississippi. *See Thompson v. Chrysler Motors Corp.,* 755 F.2d at 1170 (discussing "general" jurisdiction). The inquiry then is whether the facts support the exercise of "specific" jurisdiction since this controversy arises out of or is related to defendants' contact with Mississippi. *See id.* In *Bearry v. Beech Aircraft Corporation,* 818 F.2d 370 (5th Cir.1987), the court articulated the standard which must be satisfied where "specific" personal jurisdiction is asserted over a nonresident defendant:

When the cause of action relates to the defendant's contact with the forum, the "minimum contacts" requirement is satisfied, and "specific" jurisdiction is proper, *so long as the contact resulted from*

*defendant's purposeful conduct and not the unilateral activity of the plaintiff.*

*Bearry,* 818 F.2d at 374 (emphasis added). The individual defendants here claim that they simply authored a book—nothing more. However, in addition to writing the Book, these defendants entered into a publishing contract giving Random House the right to print, publish and sell their Book in an effort to distribute the Book on a widespread basis, both nationally and internationally. Although de Barbin and Matera may not have specifically instructed Random House to distribute the product of their efforts, the Book, in Mississippi, that was not only foreseeable but also desirable to these defendants. They had a vested interest in the success of the Book and in the court's opinion, could easily have foreseen not only the distribution of the Book in Mississippi[4] but also the possibility of injury in Mississippi since portions of the Book, and in particular, the portion claimed by plaintiff to be defamatory, recount events which transpired in Mississippi and describe the persons involved in those events, including plaintiff. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984) (reporter and editor of national publication not insulated from jurisdiction by virtue of status as mere employees despite claim that they had no direct economic stake in employer's sales or ability to control employer's marketing activity). In sum, the contact between defendants de Barbin and Matera and the State of Mississippi unquestionably resulted from purposeful conduct by them. They may not be insulated by a publishing contract from this court's exercise of jurisdiction. Accordingly, the motion of de Barbin and Matera for lack of personal jurisdiction should be denied.

In chapter one of the Book, which contains the statements which are the focus of plaintiff's complaint, de Barbin describes, in first person, her early childhood experiences which culminated in her marriage, at age eleven, to a brutal forty-five year old man by the name of Richard "Dixie" W.D.

Ware. The plaintiff in this cause was the sister of "Dixie" Ware, who is now deceased. According to the account related in the Book, de Barbin's grandmother, together with a woman referred to as Aunt Victoria, upon "payment" by Ware, arranged the marriage between de Barbin and Ware and, against de Barbin's will, forced her to marry Ware.

I was just eleven. I had never even had a boyfriend ... She [my grandmother] told me I didn't have to worry about finding a husband. It was all arranged. There was a nice man who thought I was pretty and had agreed to marry me. I would be taken to him in Jackson, Mississippi ...

I was taken to a wide, gray house with tall ceilings and dusty rugs. The man's sister came to stay with me and prepare me for the wedding. She looked like the house, drab and gray. She kept asking, "What's wrong with you?" because I was pale and frightened. I was so afraid that I kept throwing up in the bathroom ...

A second woman, equally unpleasant, came and handed me a dismal skirt, blouse, and jacket to wear as my wedding gown. I was told that the man didn't want anything special so as not to attract attention. I knew it was because of my age. The woman left me alone to dress.

I stared in the mirror, trying to understand why all of this was happening. I kept telling myself that God had a reason for everything. I thought of running away, but where could I go? ... I tried to stay strong. I brushed away the tears so no one would see them.

I was taken outside and put in a car between the man and his sister. No one said anything.... I was brought before a man dressed in black, a justice of the peace.

He mumbled some words without smiling and then ordered me to say "I do." I did as I was told. With a strange man be-

---

4. The court notes that it is common knowledge that the late Elvis Presley, the person about whom the Book was written, was born in Mississippi.

hind me, and two strangers standing beside me, I was married. We were driven back to the house. The women left.

The remaining portion of chapter one contains de Barbin's description of her wedding night, a "horrible nightmare" in which Ware forced himself upon her against her will.

A second portion of chapter one, authored by Dary Matera, a professional journalist, is an editorial-type commentary:

> To this day, Lucy doesn't realize, or has refused to accept, the fact that she was sold like a slave to the highest bidder. The party at her house was actually a discreet auction with Lucy as the prized property. "Aunt" Victoria was probably the wife of the local marriage broker, or possibly a marriage broker herself....
>
> The winner of this auction was Richard "Dixie" W.D. Ware ... The house in Monroe that Ware offered Lucy's family may have been only part of the price he paid for a beautiful eleven-year-old "thoroughbred." ...
>
> It is also significant that Lucy was brought to Mississippi to be married. In 1947, the minimum legal age a girl could marry with parental consent in Louisiana was sixteen. In Mississippi, the minimum age was twelve.

Mitchell charges that the statements contained in the Book which refer to Ware's sister are directed toward her, as she was the sole living sister of Ware, and are false in that she never participated in or cooperated with any " 'slave auction,' purchase, enticement, harboring, transportation or marriage of any unwilling eleven year old child to plaintiff's brother, Richard "Dixie" W.D. Ware." She acknowledges that she witnessed the marriage of de Barbin and Ware, but states that "such marriage [was] with the apparent full consent of both parties[,]" that the marriage took place in Louisiana, not in Mississippi, and that she, plaintiff, never participated in or cooperat-

ed with any "maltreatment, abuse or brutality directed toward defendant Lucy de Barbin by Richard Ware[,]" and that Ware, her brother, "never conducted himself in such a fashion toward his wife, Lucy de Barbin."

## DEFAMATION

■ To establish a claim of defamation, plaintiff must demonstrate the following:

> (1) a false and defamatory statement concerning [her]; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Chatham v. Gulf Publishing Company, Inc.,* 502 So.2d 647, 649 (Miss.1987) (quoting *Restatement (Second) of Torts,* § 558 (1977)). To be actionable as defamation, the statements made must be false and must be clearly directed toward and be "of and concerning plaintiff." *Ferguson v. Watkins,* 448 So.2d 271 (Miss.1984). In the case at bar, although plaintiff is not identified by name in the Book, it is undisputed that the references to Ware's sister are references to plaintiff. However, the majority of the excerpts claimed by plaintiff to be defamatory refer not to plaintiff, either directly or indirectly, but to her brother, Richard Ware, and to others who participated in the alleged sale and subsequent marriage of de Barbin to Ware.[5] In *Wilson v. Retail Credit Co.,* 325 F.Supp. 460 (S.D.Miss.1971), *aff'd,* 457 F.2d 1406 (5th Cir.1972), the court, though noting that Mississippi law in the area was unclear, held that

> [a]s a general rule, a third party has no action for damages suffered by reason of the defamation of another party. Similarly the defamation of one family member does not normally give rise to a cause of action by another family member.

---

**5.** The court notes that plaintiff cannot assert a cause of defamation on behalf of her deceased brother, Richard Ware, as a cause of action for libel does not survive the death of either the

wrongdoer or the person injured. *See Catchings v. Hartman,* 178 Miss. 672, 174 So. 553 (1937).

*Wilson,* 325 F.Supp. at 463. The court explained that while there will necessarily be persons such as spouses and other close relatives of a person libeled who will experience its impact, "the libel is not actionable by them unless it can be shown that the libel in question was published of and concerning them." *Id.; see also Brewer v. Memphis Publishing Co., Inc.,* 626 F.2d 1238, 1244 (5th Cir.1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981) (with limited exception, only person defamed, the one to whom article refers, has cause of action for libel; his or her relatives do not). The court in *Brewer* noted examples of circumstances in which a defamation of one person may also defame another who is not named. *Id.* at 1244 n. 9. In each example, a defamatory comment directed toward one person necessarily had the effect of defaming another since the defamatory statements by definition imputed improper conduct to one not named.[6] This is not such a case. The only passage which refers to plaintiff recounts her involvement in the wedding:

> The man's sister came to stay with me and prepared for the wedding. She looked like the house, drab and gray. She kept asking, "What's wrong with you?" because I was pale and frightened. I was so afraid that I kept throwing up in the bathroom.... I was taken outside and put in a car between the man and his sister. No one said anything.... With the strange man beside me, and two strangers standing behind me, I was

married.... We were driven back to the house. The woman left.

This passage, with only fleeting reference to plaintiff, represents the only portion of the book which might form the basis of a cause of action for defamation, inasmuch as the remainder of the book is not "of and concerning plaintiff." [7]

Under Mississippi law, the trial court in a defamation case must make the threshold determination of whether the language in question is actionable. *Brewer v. Memphis Publishing Co.,* 626 F.2d at 1245. In this regard, Mississippi recognizes the common law rule that

> [a]ny written or printed language which tends to injure one's reputation, and thereby expose him to pulic hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se.

*Fulton v. Mississippi Publishers Corp.,* 498 So.2d 1215, 1217 (Miss.1986) (quoting *Ferguson v. Watkins,* 448 So.2d 271, 275 (Miss.1984)). Moreover, to state a claim for defamation, it is necessary that the defamation be "clear and unmistakable from the words themselves and not the product of innuendo, speculation or conjecture." *Ferguson,* 448 So.2d at 275.

 Random House takes the position that the statements claimed by plaintiff to be libelous are true or are not defamatory. It does appear, in the court's opinion, that the relevant statements are literally true; [8]

---

**6.** The specific examples cited by the *Brewer* court were derived from comment e of the *Restatement (Second) Torts* § 564 (1977), as follows:

> A calls B a cuckold in the presence of C. A has defamed B's wife.
> A states to B that C is an illegitimate child. A has defamed C's mother.

*Brewer,* 626 F.2d at 1244 n. 9. In the first example, calling B a cuckold by definition charges B's wife with being an adulteress. In the second, calling C an illegitimate child by definition also charges C's mother with being an adulteress or a harlot. As Random House correctly observes, each statement about one person is defamatory as to the person not named because each statement automatically places the unnamed person in the certain status that

would subject that person to scorn or ridicule or lower his or her reputation in the community.

**7.** Although statements which do not refer to plaintiff cannot form the basis of a cause of action for defamation, they are not irrelevant. These are considered to the extent that they place in perspective those statements which do refer to plaintiff. The Mississippi Supreme Court has recognized that in determining whether a publication is libel, it must be considered as a whole, in context, and its meaning must be ascertained from the language used, as commonly understood. *See Manasco v. Walley,* 216 Miss. 614, 63 So.2d 91 (1953).

**8.** In her complaint, Mitchell charges that the Book contains a falsity in that it states the marriage occurred in Mississippi, whereas in fact the marriage took place in Louisiana. In

that is, the depiction of events is substantially accurate as it pertains to plaintiff inasmuch as plaintiff herself acknowledges that she witnessed the marriage between Lucy de Barbin and Richard Ware.[9] Although Mitchell avers that the writing contains an "untrue" portrayal of her role in the marriage of de Barbin and Ware, it appears that her objection is that the writing contains false implications regarding that matter. Specifically, she contends that the writing falsely implies that she participated in and cooperated with the marriage of an unwilling eleven year old child to plaintiff's brother and further participated in and/or cooperated with maltreatment, abuse or brutality directed toward Lucy de Barbin by plaintiff's brother Richard Ware. The question, therefore, is whether the statements could reasonably be viewed as attacking the character or reputation of plaintiff or in any way defaming her and, therefore, could be found by a jury to be libelous. That is, the issue is whether the statements complained of are capable of a defamatory meaning.

> It is the function of the trial court to determine whether the communication complained of "bears the meaning ascribed to it by the plaintiff, and if so, whether this meaning is defamatory." *Fulton* at 1216; [citations omitted]. "If the court decides against the plaintiff upon either of these questions, there is no further question for the jury to determine and the case is ended." *Restatement (Second) of Torts*, § 614 (1977). Should the trial court determine, however, that the language is "ambiguous, of doubtful import, or susceptible to two or more interpretations, its actionability must ordinarily be decided by the jury under appropriate instructions from the court." *Brewer* at 1245, citing *Cameron*

*Bros. v. Posey,* 237 Miss. 432, 115 So.2d 138 (1959).

*Chatham v. Gulf Publishing Company, Inc.,* 502 So.2d at 649. In making the determination as to the actionability of alleged defamatory statements,

> [T]he meaning to be ascribed to the publication is that which the recipient would correctly, or mistakenly but reasonably understand as intended to be expressed —provided the recipient did actually understand it in the defamatory sense.

*Lizak v. Associated Indemnity Corp.,* 615 F.Supp. 17, 19 (S.D.Miss.1985) (quoting *Conroy v. Breland,* 185 Miss. 787, 189 So. 814, 816 (1939)). The court has carefully considered the language of which plaintiff complains and can reach but one conclusion, that being that the statements are not susceptible to the meaning advanced by plaintiff. Nowhere in the Book is it stated or even implied that Mitchell participated in or cooperated with or had knowledge of any maltreatment of de Barbin by Ware, or that she had any involvement whatsoever or was even aware of any alleged "sale" of de Barbin to Ware. Mitchell admits that she witnessed the marriage, and despite her protestations to the contrary, there is nothing in the Book which intimates that she was aware that de Barbin was an unwilling participant in the marriage. In fact, the Book relates that de Barbin concealed her true feelings from everyone, including plaintiff:

> I tried to stay strong. I brushed away the tears so no one would see them.

It is made clear in the Book that de Barbin was physically mature for her age and appeared older than she was:

> Aunt Victoria caught me primping one day and said, "Lucy, you're a very pretty

terms of a claim for defamation to plaintiff, the court fails to see the relevance in this misstatement, assuming it is a misstatement, particularly since the commentary by Matera states that in 1947, the relevant time frame, the minimum age for marrying in Mississippi was twelve whereas in Louisiana it was sixteen. That is, de Barbin was much closer to the marrying age in Mississippi than the marrying age in Louisiana.

**9.** The court does not hold nor imply that the statement that plaintiff looked "drab and gray[,]" and the implication that she was "unpleasant" are true. However, these statements unequivocally are not statements of fact and amount to nothing more than the writer's opinion as to plaintiff's appearance and demeanor. The statements, therefore, cannot be libelous. *See* W. Prosser & W. Keeton, *The Law of Torts* § 113A (5th ed. 1984) (derogatory opinion cannot form basis of defamation claim).

girl and your breasts are very large. *You look older than you really are.* Some young man might be interested in you. *Don't tell anyone how young you really are ..."*

I was self-conscious about my breasts. I wanted to look like my friends.... I was always trying to hide my figure under baggy clothes.

The Book does not intimate that plaintiff knew or had any reason to suspect that de Barbin was not of marrying age; in fact, she had reason to believe that de Barbin was older than she actually was.

Plaintiff urges that the defamatory meaning of the words can hardly be questioned in light of Miss.Code Ann. § 97–5–5 under which it is a crime and was in 1947 a crime for any person to

> maliciously, wilfully or fraudulently lead, take, carry away, decoy or entice away, any child under the age of fourteen years, with intent to detain or conceal such child from its parents, guardian, or other person having lawful charge of such child, or for the purpose of prostitution, concubinage, or marriage....

According to plaintiff, the accusation that she participated in, cooperated with, assisted in, conspired with, and aided and abetted the coerced marriage is an accusation of criminal conduct and is therefore clearly capable of a defamatory meaning. If the language used in the Book could reasonably be construed as such an accusation against Mitchell, then the language could be said to be capable of a defamatory meaning. Here, however, the court has concluded that, as a matter of law, the language is not reasonably susceptible of the defamatory meaning ascribed to it by Mitchell. *See Brewer,* 626 F.2d at 1245 (if court determines that communication does not bear meaning ascribed to it by plaintiff, there is no need to determine whether meaning is defamatory). Only by "innuendo, speculation or conjecture" could plaintiff, or anyone reading the passages complained of, reasonably attribute to them the meaning claimed by plaintiff. Accordingly, plaintiff's claim for defamation must fail as a matter of law.[10]

## INVASION OF PRIVACY

In her second claim for relief, Mitchell charges that the publication of the statements by defendants has "place[d] plaintiff before the public in a false light which is highly offensive to a reasonable person." The Mississippi Supreme Court has recognized the existence of the "invasion of privacy" torts which encompass four distinct theories or four "sub-torts":

> (1) the intentional intrusion upon the solitude or seclusion of another; (2) the appropriation of another's identity for an unpermitted use; (3) the public disclosure of private facts; and (4) holding another in the public eye in a false light.

**10.** Plaintiff urges that a decision by the court on the viability of her defamation claim at this juncture is premature as the facts have not been sufficiently developed. However, the nature of a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit. As explained in *Libel, Slander and Related Problems:*

> Dismissal of defamation suits for failure of the complaint to state a cause of action or to state a claim upon which relief may be granted occurs with relative frequency. One substantial factor is that the communication complained of is usually before the court at the outset; indeed in many jurisdictions it is required that complaints themselves set forth the allegedly defamatory statement. Thus, unlike most litigation, in a libel suit the central event—the communication about which suit has been brought—is usually before the judge at the pleading stage. He may assess it

> upon a motion to dismiss first hand and in context.
>
> The trial court may therefore, at the earliest stages, make sound determinations as to issues relating to the communication of which complaint is made. Thus courts routinely consider on motions to dismiss issues such as whether the statement at bar is capable of bearing a defamatory meaning, whether it is *"of and concerning"* the plaintiff, whether it is protected opinion, whether there is jurisdiction over the defendant, and whether the suit is barred by privilege and frequently grant motions on these grounds and others.

R. Sack, *Libel, Slander and Related Problems* 533–34 (1980); *see also Lenoir v. Tannehill,* 660 F.Supp. 42, 44 (S.D.Miss.1986) (plaintiff in defamation action required under Mississippi statute to plead "words or matter" constituting alleged defamation); Miss.Code Ann. § 11–7–53 (1972).

*Prescott v. Bay St. Louis Newspapers, Inc.*, 497 So.2d 77, 79 (Miss.1986); *see also Deaton v. Delta Democrat Publishing Co.*, 326 So.2d 471 (Miss.1976).[11]

■ Plaintiff complains of an invasion of her privacy by being placed in a false light before the public. In *Prescott*, the court observed that apart from acknowledging false light as a theory of recovery recognized by other courts, it had not yet confronted the issue of whether it would recognize the theory. The plaintiff in *Prescott* brought an action against a local newspaper alleging that photographs and news items concerning an automobile accident in which he was involved held him out to the public in the false light of a drunkard by publicizing a prior arrest for driving under the influence. The court concluded that it was unnecessary to delineate its position regarding recognition of a cause of action for false light invasion of privacy since the court was of the opinion that the plaintiff had failed to present a false light case as a matter of law. In so finding, the court noted the similarity of false light privacy and defamation claims, noting in particular that essential to both claims is a determination that "the matter published concerning the plaintiff is not true." *Id.* (quoting *Restatement (Second) of Torts* § 652E, comment a, at 395).[12] The court explained that

> [l]ike defamation, truth is a defense to false light, Miss. Const. art. III § 13 (1890), and if the statement is not false, little else matters.
>
> We are aware that truthful statements may yet leave a false impression. The context itself may create a false impression.... A false impression may be created by the omission of pertinent facts.

*Prescott*, 497 So.2d at 80 (citations omitted). Nevertheless, a claim for false light, like a claim for defamation, requires that

> [t]he words used must have been clearly directed at the plaintiff (and) [the false light] must be clear and unmistakable from the words themselves and not the product of innuendo, speculation or conjecture.

*Id.* (quoting *Fulton v. Mississippi Publishers Corp.*, 498 So.2d 1215, 1217 (Miss. 1986)).

■ In a diversity action, where the state's highest court has not spoken, the federal court is charged with ascertaining from all available information what the state law is and then applying it. Here, the state's highest court has spoken, but in doing so, purposefully avoided taking a position on whether Mississippi will recognize a cause of action for invasion of privacy by placing one in a false light in the public's eye. While the court's extended discussion concerning the contours of such a claim could perhaps be read as an indication that the Mississippi court views the cause of action favorably, it is unnecessary for this court to make that prediction. Even assuming the viability in Mississippi of a false light cause of action, the plaintiff in the case at bar, just as the plaintiff in *Prescott*, has not stated such a claim. What Mitchell complains of, as noted previously, is that the statements contained in the book leave a false impression that she participated in the marriage of an unwilling eleven year old to her brother. Plaintiff does not contest the truthfulness of the statements themselves and the statements used cannot reasonably be said to create the impression which plaintiff urges. As the court in *Prescott* observed, plaintiff "can only rely on innuendo, speculation or

---

**11.** Plaintiff has also averred that the publication constitutes an unjustified, unprivileged and unwarranted intrusion into her privacy and misrepresents private facts concerning her and her family and exploits such private facts for the purpose of commercial gain. Although plaintiff's complaint appears to be an effort to plead each of the privacy torts, she has disavowed any such intention and apparently views herself as having attempted to assert nothing more than a claim for false light invasion of privacy.

**12.** Although the elements of causes of action for defamation and false light invasion of privacy are similar, the difference in the two torts lies in the injury sought to be redressed. Defamation involves injury to reputation whereas invasion of privacy provides recovery for mental distress. *See Prescott*, 497 So.2d at 80 (citing *Rinsley v. Brandt*, 700 F.2d 1304 (10th Cir.1983)).

conjecture to make out [her] case and this is not enough." *Prescott,* 497 So.2d at 81.

## INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The final claims asserted by plaintiff are for intentional and/or negligent infliction of emotional distress based on her allegation that "as a direct and foreseeable consequence of the acts of [defendant] ... in publishing the ... statements, plaintiff has suffered extreme mental and emotional distress." Plaintiff's claims for infliction of emotional distress are based upon the same facts upon which she bases her claims for defamation and invasion of privacy. In the court's opinion, plaintiff's claim must fail as a matter of law.

The essence of plaintiff's complaint, in the court's view, is an alleged defamation; thus, her attempt to state a separate claim for emotional distress is superfluous. Only if the recitation of facts concerning Mitchell's role in the marriage of de Barbin and Ware was susceptible of the meaning advanced by plaintiff would the statements be capable of a defamatory meaning; the court has now rejected plaintiff's contention regarding the meaning of the statements.

The requisite elements to sustain a cause of action for intentional infliction of emotional distress have been recognized as follows:

> One who by extreme and outrageous conduct intentionally and recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. ... [G]enerally, the case is one in which the recitation of the fact to an average member of the community would arouse as a resentment against the actor, and lead him to exclaim, "outrageous."
> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Burris v. South Central Bell Telephone Company,* 540 F.Supp. 905, 909 (S.D.Miss.

1982) (quoting *Restatement (Second) of Torts,* § 46, comment(d)). Since the language used is not capable of being understood in the manner urged by plaintiff, an average member of the community could not reasonably resent the defendants' publication of the statements nor proclaim their conduct "outrageous."

As for plaintiff's claim for negligent infliction of emotional distress, a requirement of the tort is reasonable foreseeability of injury to plaintiff. That is completely lacking in the case at bar. If one could not reasonably understand the text complained of to mean what plaintiff urges, it follows that one could not reasonably foresee an injury based upon that language. Accordingly, the court is of the opinion that plaintiff's emotional distress claims fail as a matter of law.

In sum, the court concludes that each of the claims of the complaint in this cause should be dismissed pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. Accordingly, the motion of defendants Random House, de Barbin, and Matera should be granted and this cause dismissed with prejudice. A separate judgment shall be entered in accordance with Federal Rule of Civil Procedure 58.