# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00658-COA

**GARTH BISSETTE, PH.D.**                                **APPELLANT**

**v.**

**UNIVERSITY OF MISSISSIPPI MEDICAL**            **APPELLEES**
**CENTER, WILLIAM WOOLVERTON, PH.D.,**
**CRAIG STOCKMEIER, PH.D., JEFFERSON**
**PARKER, PH.D., GRAYSON NORQUIST, PH.D.**
**AND JAMES KEETON, M.D.**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/02/2018 |
| TRIAL JUDGE: | HON. WILLIAM A. GOWAN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | WILLIAM MATTHEW BURCH |
| | YANCY B. BURNS |
| | JONATHON GARTH BISSETTE |
| ATTORNEYS FOR APPELLEES: | JOHN T. KITCHENS |
| | R. E. PARKER JR. |
| | MINOR F. BUCHANAN |
| | ROBERT V. GREENLEE |
| | THOMAS EUGENE WHITFIELD JR. |
| | PENNY B. LAWSON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 06/25/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., McDONALD AND C. WILSON, JJ.**

**McDONALD, J., FOR THE COURT**:

¶1. Former tenured professor Garth Bissette, Ph.D sued the University of Mississippi

Medical Center (UMMC), William Woolverton, Ph.D., Craig Stockmeier, Ph.D., Jefferson

Parker, Ph.D., Grayson Norquist, Ph.D., and James Keeton, M.D. for breach of a separation

agreement, false representation, and civil conspiracy. Bissette specifically sued Woolverton for slander as well. The Hinds County Circuit Court granted the defendants' motions for summary judgment and dismissed the case. From that dismissal, Bissette appeals.

**FACTS**

¶2. Bissette is a psychoneuroendocrinologist who was recruited from Duke University in 1995 by UMMC's Dr. Angelos Halaris, Chairman of the Department of Psychiatry and Human Behavior. In 2002, Bissette was awarded tenure pursuant to Dr. Halaris's glowing summary of his accomplishments. Between 2002 and 2005, Bissette's annual reviews were satisfactory.

¶3. In 2005, Stockmeier became the division director of research in the Department of Psychiatry and Bissette's immediate supervisor. Between 2005 and 2010, Stockmeier gave Bissette five unsatisfactory performance evaluations, two of which were reversed by department chair Norquist. But Bissette's three unsatisfactory ratings triggered UMMC's Post Tenure Review procedure in May 2011. That procedure involved a review by a three-member committee, two of whom were chosen by Bissette's department chair, Norquist, and one chosen by Bissette. The three committee members were to review Bissette's work and recommend to Norquist either dismissal or remediation plans. Bissette chose Ian Paul, Ph.D., and Norquist chose Woolverton and Parker to form the committee. Bissette made no objection to these appointments. The committee was advisory, and Norquist was not bound by its recommendation. If Bissette was dissatisfied with Norquist's decision, he could pursue further procedural appeals under UMMC's policies and procedures.

¶4. The committee interviewed Stockmeier and covered the negative reviews he had given Bissette. They met twice with Bissette who told the committee that he felt that Stockmeier may have retaliated against him because Norquist had overturned one of Stockmeier's negative reviews. Bissette also said that Stockmeier was biased because he focused his annual review on things Bissette did not do well (e.g., maintain a productive research program) rather than on things that he did do well (national service). The committee also met with Norquist and Dr. Celso Gomez-Sanchez, who collaborated with Bissette briefly. In a written report, the committee recommended termination, which the committee said it did not take lightly especially because Bissette was a tenured colleague who had been a member of the department for fifteen years. But the committee felt past remediation plans had been clear and reasonable but not met. The committee felt further remediation plans would not improve the situation, and they voted unanimously to recommend dismissal.

¶5. Instead of continuing the post-tenure review process, Bissette reached an agreement with UMMC to remain employed through November 2011 at full pay with benefits and then resign. UMMC agreed to give Bissette a favorable recommendation, and Bissette agreed to release UMMC from any and all claims Bissette may have had from either his employment or termination. These terms were memorialized in a Separation Agreement and Release ("Separation Agreement") on May 31, 2011, and signed by Bissette and Keeton, who as Vice Chancellor at UMMC signs all contracts on behalf of UMMC. The terms of the agreement, which included an agreement not to disparage each other, were to remain confidential. Norquist said he was made aware of the agreement but not of its contents. Norquist also

3

confirmed that Woolverton was not told of either the agreement or the contents. Thereafter, Bissette continued to work through November 2011, received his pay, and then resigned.

¶6. In March 2012, Woolverton attended a conference sponsored by the National Institute of Health (NIH) in Washington, D.C. He was paid a stipend and his expenses by NIH for his work reviewing grants at the conference. Woolverton lunched one day with two other conferees, Dr. Michael Owens of Emory University and Dr. Steven Dworkin of Western Illinois University. On the way back to the conference, Dr. Owens asked Woolverton how Bissette was doing, to which Woolverton allegedly responded that Bissette had been subject to the post-tenure review after three unsatisfactory annual reviews and eventually terminated. Woolverton also allegedly said that Bissette was only hired because of a threat of blackmail made against Dr. Halaris, chairman of the department at the time. Woolverton further allegedly stated that Bissette was "poison" to the department, that Bissette had achieved no professional accomplishments during his tenure, and that he did nothing with regard to scholarship or professional service following his annual reviews. Woolverton added that Bissette was often intoxicated upon returning to work from lunch. Although Dr. Dworkin recalled the conversation slightly differently, he did confirm Woolverton's comments for the most part except for statements concerning "blackmail" or "poison." Dworkin also said that it appeared to him that Dr. Owens was aware of Bissette's dismissal and was trying to get more information concerning it.

¶7. When he learned about this conversation, Bissette wrote to Keeton. Bissette felt Wolverton's statements revealed Woolverton's personal animosity against him, which

4

Bissette felt had to have tainted the integrity of the post-tenure review process itself. Bissette said he felt he was denied an unbiased review and that he was fraudulently induced into relinquishing his right to continued employment. He threatened to file a lawsuit if they could not resolve the matter, and he specifically deemed the letter to be his notice of claim to UMMC under Mississippi Code Annotated section 11-46-1 (Rev. 2012).

¶8. On December 6, 2012, Bissette filed his complaint against UMMC, Woolverton, and other doctors in Hinds County Circuit Court. He pleaded causes of action for slander, fraud, fraudulent concealment, fraudulent inducement, tortious interference with prospective contracts, breach of contract, bad faith breach of contract, negligent and intentional infliction of emotional distress, and civil conspiracy. After answers were filed and the court entered a scheduling order, Woolverton died on June 13, 2013. Woolverton's attorneys filed a suggestion of death, and on August 1, 2013, Bissette filed a motion for leave to substitute Woolverton's estate; however, no estate was ever opened or substituted. On the theory that Bissette was fraudulently induced to sign the Separation Agreement and would not have left his employment, Bissette's expert economist calculated his past and future wage loss at $1,562,734.

¶9. During the years the case was pending, the parties exchanged written discovery and filed motions, but no depositions were taken. Ultimately, all parties submitted motions for partial summary judgment or summary judgment. Bissette moved for partial summary judgment alleging that Woolverton had breached the Separation Agreement; Woolverton's counsel filed for summary judgment on the claims against him; and UMMC, Keeton,

5

Norquist, Parker, and Stockmeier moved for summary judgment on all claims. The circuit court granted the defendants' motions and denied Bissette's in its "Findings of Fact, Conclusions of Law, and Order of Dismissal" entered on August 2, 2018. Bissette appeals from that judgment.

## STANDARD OF REVIEW

¶10. Appellate review of a trial-level court's grant or denial of a motion for summary judgment is de novo. *Adams v. Graceland Care Ctr. of Oxford LLC*, 208 So. 3d 575, 579 (¶9) (Miss. 2017). Rule 56(c) of the Mississippi Rules of Civil Procedure provides that summary judgment is proper where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "When considering a motion for summary judgment, the trial-level court must view all evidence in a light most favorable to the non-moving party." *Morton v. City of Shelby*, 984 So. 2d 323, 329 (¶10) (Miss. Ct. App. 2007). Questions concerning the construction and interpretation of contracts are questions of law which we review de novo. *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 751 (¶4) (Miss. 2003).

## DISCUSSION

I. **Whether the circuit court erred in granting summary judgment in favor or UMMC, Stockmeier, Parker, Norquist, and Keeton on the breach of contract claim.**

¶11. Bissette's breach of contract claim turns on whether Woolverton was a party to the Separation Agreement and Woolverton's status with respect to UMMC when he made his

6

March 2012 comments.

### A. The Parties to the Contract

¶12. The Separation Agreement begins with the following statement:

> This agreement is being entered into on May 12, 2011, between The University of Mississippi Medical Center for the benefit of itself, all related corporate entities, its and their officers, directors, employees, agents, successors, and assigns (hereinafter "UMMC") and Dr. Garth Bissette, (hereinafter "Employee").

Bissette claims that this language makes Woolverton, UMMC's employee, a party to the Separation Agreement and binds Woolverton to the confidentiality and non-disparagement clauses. UMMC, Woolverton, and the other doctors argue that the very language "for the benefit of" makes Woolverton and all other employees merely third-party beneficiaries of the agreement—not contracting parties. The circuit court agreed with the defense, finding that "[a]s third-party beneficiaries, the individual defendants were not parties to nor bound by the contract in their individual capacities."

¶13. In order to recover damages from a breach of contract, or for failure to carry out the terms of the contract, there must be a relationship of privity of contract between the party damaged and the party sought to be held liable for the breach of the contract. *Burns v. Washington Savs.*, 171 So. 2d 322, 324 (1965)(citing *Jones v. Mississippi Farms Co.*, 76 So. 880 (Miss. 1917)); 17 Am. Jur. 2d *Contracts* § 297 (1964); 17A C.J.S. Contracts § 519(2) (1963)0. Moreover, "[a] contract cannot bind a nonparty." *Colyer v. First United Methodist Church of New Albany*, 214 So. 3d 1084, 1088 (¶18) (Miss. Ct. App. 2016) (citing *E.E.O.C. v. Waffle House Inc.*, 534 U.S. 279, 308 (2002)). A third-party beneficiary to a contract is

7

a person who is not a party to a contract but who would benefit from its performance. The third-party beneficiary has no direct privity with the promissor, although he may enforce a promise made for his benefit even though he is a stranger to the contract or to the consideration. *Burns*, 171 So. 2d at 325.

¶14. On appeal, Bissette argues that the Separation Agreement language "for the benefit of" is ambiguous and because UMMC drafted it, Bissette's understanding and interpretation of it should be accepted. Bissette further argues that the circuit court erred because the agreement never uses the words "third-party beneficiary" because UMMC had inferred that employees were covered by the agreement in its initial response to the motion for partial summary judgment, and because Bissette feels that such an interpretation would produce an absurd result. We disagree.

¶15. Whether a contract is ambiguous is a question of law for the court to determine and if it is not, the contract should be enforced as written.[1] *Royer Homes*, 857 So. 2d at 751 (¶7). In making that determination, the court "must review the express wording of the contract as a whole." *Epperson v. SOUTHbank*, 93 So. 3d 10, 16 (¶17) (Miss. 2012). "The mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." *Royer Homes*, 857 So. 2d at 753 (¶10). If no ambiguity exists, this Court will accept the plain meaning of the instrument as the intent of the parties. *Freese v. Mitchell*, No. 2012-CA-01045-SCT, 2014 WL 1946593, at *6 (¶30) (Miss. May 15, 2014); *B.C. Rogers Poultry Inc. v. Wedgeworth*, 911 So. 2d 483, 487 (¶8) (Miss. 2005);

---

[1] "Where a contract is unambiguous, the parties are bound by the language of the instrument." *Delta Pride Catfish Inc., v. Home Ins. Co.*, 697 So. 2d 400, 404 (Miss. 1997).

*IP Timberlands Operating Co. v. Denmiss Corp*., 726 So. 2d 96, 108 (¶50) (Miss. 1998).

Moreover, "courts do not have the authority to modify, add to, or subtract from the terms of a contract validly executed between two parties." *Wallace v. United Miss. Bank*, 726 So. 2d 578, 584 (¶23) (Miss. 1998).

¶16.     Here the circuit court found no ambiguity with respect to the identification of the contracting parties, namely UMMC and Dr. Bissette.  We agree.  The contract language clearly bestowed third-party beneficiary status on categories of other individuals and entities (UMMC entities, directors, employees) because it used the words "for the benefit of" when referring to them.  A party cannot ignore clear language in a contract.[2]  This Court must construe the agreement as made by the parties and give the words of the document their commonly accepted meaning.  Here the common meaning of "for the benefit of" is clear. The agreement did not say UMMC and all related corporate entities, its and their officers, directors, employees.  And it did not use the words "on behalf of," which may have raised issues of agency.  We cannot drop the "for the benefit of" language as Bissette would have us to do.  We find that the wording of the contract concerning the parties to it was not ambiguous and that UMMC and Bissette were the sole parties bound by the terms of the Separation Agreement.  Moreover, contrary to Bissette's argument, any other construction is absurd.  If every employee of UMMC or its affiliates were bound by the terms of the Separation Agreement, then even a receptionist at a UMMC clinic would have to be apprised

---

[2] For example, in *Royer Homes*, when a party challenged whether a settlement and release reserved a claim, the supreme court pointed out that Royer was ignoring the language in a paragraph that specifically reserved warranty claims "hereinafter asserted" and Chandeleur's claim was not listed. *Royer Hones*, 857 So. 2d at 753 (¶14).

of the contract and its provisions. This would make the confidentiality provision meaningless and the contract internally inconsistent. Therefore, UMMC's "related corporate entities, its and their officers, directors, employees, agents, successors and assigns" were not parties but mere third-party beneficiaries of the contract between UMMC and Bissette.

### B. Breach of Contract

¶17. "A breach-of-contract case has two elements: (1) the existence of a valid and binding contract, and (2) a showing that the defendant party has broken, or breached it." *Maness v. K&A Enters. of Miss. LLC*, 250 So. 3d 402, 414 (¶43) (Miss. 2018). The parties agree that the Separation Agreement was a valid and binding contract. Bissette claims that Woolverton's March 12, 2012 comments constitute a breach of the confidentiality[3] and non-disparagement[4] clauses of the Separation Agreement. The circuit court held that at the time Woolverton made his comments, he was not acting in the scope of his employment with

---

[3] The relevant portion of the Confidentiality clause (#8) includes:

You (Bissette) further agree that this Agreement and all of its terms and conditions are confidential.

UMMC, its officers and directors agree that this Agreement and all of its terms and conditions are confidential. UMMC, its officers and directors agree that they will not communicate or disclose the terms of this Agreement to any person other than those . . . that are necessary to carry out the terms and conditions of this Agreement.

[4] The Non-disparagement clause reads:

9) **Agreement Not to Disparage**. In further consideration for the above, you and UMMC agree to refrain from making any disparaging remarks or comments whatsoever about each other, including UMMC and/or its current or former employees, officers and/or directors and/or their work, medical facilities, medical care, products or services.

UMMC; therefore, UMMC was not liable for his actions and there was no breach by UMMC. We agree.

¶18. First, because Woolverton was not a party to the contract, there is no breach of the agreement by him individually. For UMMC to be bound by Woolverton's actions, Bissette would need to show that Woolverton was an employee of UMMC acting in the scope of his employment and in furtherance of his employer's business at the time the comments were made. *Booth v. S. Hens Inc.*, 244 So. 3d 888, 890 (¶8) (Miss. Ct. App. 2018). Bissette claims that the affidavits of Dr. Michael Owens and Dr. Steven Dworkin establish that Woolverton attended the March NIH conference "as a representative of UMMC *as stated in [their] affidavits*." (Emphasis added). But these affidavits do not say this. Dr. Owens's affidavit merely states that numerous other professors who are employed by various schools attended the panel meeting, including Woolverton from UMMC. Dr. Dworkin's affidavit says the same thing and further states that NIH paid all travel and hotel expenses and provided a $200 per day stipend to participants. Neither affidavit proves that Woolverton was at the meeting at the directive of UMMC, his employer, or that Woolverton's participation at the NIH panel meeting was furthering some business of UMMC. Further, Bissette presented no evidence that Woolverton's comments about Bissette made to these two doctors were made at UMMC's direction or to further some nefarious purpose that UMMC had. Thus, UMMC is not vicariously liable for Woolverton's comments.

¶19. Nor does Woolverton's status as an employee at the time of his statements make him an agent of UMMC. The Mississippi Supreme Court has noted that "the word 'employee' is not synonymous with the word 'agent' because an agent is one who stands in the shoes of

11

his principal; he is his principal's alter ego", standing in place for his principal by authority from that principal. *First Jackson Sec. Corp. v. B. F. Goodrich Co.*, 176 So. 2d 272, 278 (Miss. 1965). "The burden of proof as to the existence of an agency relationship rests with the party asserting it." *Aladdin Cons. Co. Inc. v. John Hancock Life Ins. Co.*, 914 So. 2d 169, 177 (¶14) (Miss. 2005). Bissette provided no evidence that UMMC sent Woolverton to the conference on UMMC's behalf. To the contrary, the evidence showed that NIH paid all the expenses and a stipend to Woolverton to attend. Although Woolverton may have been an employee of UMMC at the time of his comments, he was not an agent of UMMC. Moreover, Bissette has provided no evidence to show that Woolverton made his particular comments about Bissette at UMMC's direction or to further some purpose of UMMC.

¶20. There is no genuine issue of material fact that precluded the circuit court from granting UMMC summary judgment on the claims of breach of contract. Because Woolverton was not a party to the contract and because there was no evidence that he acted in the course and scope of his employment or as an agent of UMMC, the circuit court correctly held that any disparaging comments Woolverton made did not constitute a breach by UMMC of the Separation Agreement.

**II. Whether the circuit court erred in granting summary judgment in favor of UMMC, Stockmeier, Parker, Norquist and Keeton on Bissette's tort claims.**

¶21. The circuit court granted summary judgment to the UMMC defendants on Bissette's tort claims, including fraud, misrepresentation, civil conspiracy, and slander. The court held that Bissette had not put forth sufficient proof to create a dispute of fact on any of these claims. Because Bissette sued UMMC and other individuals, we divide our discussion

12

between them accordingly.

## A. Misrepresentation Claims Against UMMC

¶22. Mississippi Code Annotated section 11-46-5(2) (Rev. 2012) reads:

> For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense other than traffic violations.

The supreme court has held that under section 11-46-5(2), torts constituting fraud, malice, libel, slander, and defamation, i.e. torts in which malice is an essential element, fall outside the scope of the MTCA's waiver of immunity. *Mark v. City of Hattiesburg*, No. 2016-CA-01638- COA, 2019 WL 125656, at *3 (¶14) (Miss. Ct. App. 2019); *Zumwalt v. Jones Cty Bd. of Sup'rs*, 19 So. 3d 672, 688 (¶83) (Miss. 2009). Thus, UMMC is not liable for the intentional torts pled by Bissette. Rather, "any legal action against a governmental employee for these intentional torts must necessarily proceed against him or her as an individual." *Univ. of Miss. Med. Ctr. v. Oliver*, 235 So. 3d 75, 82 (¶30) (Miss. 2017). Accordingly, because UMMC is immune from the intentional tort claims raised by Bissette, the circuit court did not err in dismissing the claims of fraud and slander against UMMC.

¶23. UMMC may, however, be sued for negligent misrepresentation. In order to prove negligent misrepresentation, a party must show by a preponderance of the evidence:

> (1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.

13

*Horace Mann Life Ins. Co. v. Nunaley*, 960 So. 2d 455, 461 (¶20) (Miss. 2007). In such a cause of action, a party must identify a representation made to him by a person who either knew of its falsity or failed to use due diligence to determine its falsity. For example, in *Holland v. Peoples Bank & Tr. Co.*, 3 So. 3d 94 (Miss. 2008), the plaintiff claimed that a bank employee promised him an increase in his line of credit if the price of cotton went down. *Id.* at 96 (¶2). A specific person and a specific representation were identified.

¶24. The circuit court held that Bissette had failed to introduce any evidence to create a genuine issue of material fact on several key elements of misrepresentation actions. We agree. Bissette fails to identify any UMMC person making any specific misrepresentation to him. The only "representations" that Bissette points to are the general procedures for post tenure review found in UMMC's faculty handbook. He claims that these procedures represented to Bissette that he would receive a "fair and impartial" review, though those words do not appear in the procedures identified. Notwithstanding that, Bissette argues that because he believes his review was not fair and impartial, the procedures outlined in the handbook amount to fraudulent or negligent misrepresentations. To establish the elements of either misrepresentation cause of action, Bissette would have to show that the writer of the handbook knew that its review process would not be impartial, or that the writer failed to know of its untruth. No such showing was made.

¶25. Bissette also claims that information of the review panel's animus against him was withheld from him (i.e., an actionable omission). He points to Woolverton's March 2012 comments as proof of animus; however, Bissette provides no proof that Woolverton held that same animus as the time of the post tenure review in 2011, or that UMMC or Norquist, who

14

appointed him to the review panel knew of such animus if it did exist. Bissette claims that during the review process, he suspected Parker, another committee member, was biased because of his hostility. But Bissette did not raise this alleged animus at the time, nor ask that Parker be replaced. We agree with the circuit court that Bissette produced no proof of a false representation of a material fact, either intentionally or negligently made. Therefore, we find no error in the court's grant of summary judgment for the defendants on the claims of false misrepresentation.

**B.** *Misrepresentation Claims Against Individual Doctors, Other than Woolverton*

¶26. Bissette sued Parker, who sat on his review board; Norquist, his department chair; Stockmeier, his direct supervisor; and Keeton, the Vice Chancellor who signed the Separation Agreement on behalf of UMMC for false representation. But Bissette provided no evidence that any of these individuals misrepresented any material fact to him either. "Summary judgment must be granted when the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to his case and on which he bears the burden of proof at trial.'" *Miles v. Paul Moak of Ridgeland Inc.*, 113 So. 3d 580, 584 (¶9) (Miss. Ct. App. 2012) (quoting *Borne v. Dunlop Tire Corp.*, 12 So. 3d 565, 570 (¶16) (Miss. Ct. App. 2009)). Therefore, the circuit court did not err in granting summary judgment for Parker, Norquist, Stockmeier, and Keeton on Bissette's false representation claims.

**C.** *Civil Conspiracy*

¶27. "To establish a civil conspiracy, the plaintiff must prove (1) an agreement between

two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, and (4) damages to the plaintiff as a proximate result." *Orr v. Morgan*, 230 So. 3d 368, 375 (¶17) (Miss. Ct. App. 2017). Bissette argues that he presented evidence that the post tenure review committee had no intention of giving Bissette a fair review. But Bissette's "proof" is merely his assumptions rather than facts established in the record.

¶28. While there may have been more than two persons involved in the post tenure review, one was Bissette's own choice. It is hard to believe that he would conspire against Bissette or allow an illegal act to be undertaken against Bissette. There is no proof of an agreement among the three members of the committee to do anything other than to serve. The committee's notes and report reveal no animus or unlawful purpose. Bissette claimed that they failed to follow the handbook by reviewing information prior to his 2002 appointment for tenure and did not take into consideration pre-tenure positive information about Bissette. But the policies and procedures in the record charge the committee with reviewing "the circumstances of the unsatisfactory reviews and the remediation process previously undertaken." To go back further than 2002 was required and only benefitted Bissette.

¶29. Moreover, Bissette has cited no authority to support his argument that these facts constitute a colorable conspiracy claim. The failure to cite relevant authority, or the failure to connect the relevant authority to a case procedurally bars consideration on appeal. *Crawford v. Butler*, 924 So. 2d 569, 576 (¶24) (Miss. Ct. App. 2005). Accordingly, we agree with the circuit court that this claim should be dismissed.

### III. Whether the circuit court erred in dismissing Bissette's slander

16

**claim against Woolverton.**

¶30.    The circuit court denied Bissette's motion for summary judgment on the slander action against Woolverton finding that it was not a "personal action" and did not survive Woolverton's death under Mississippi Code Annotated section 91-7-233 (Rev. 2013)[5] and *Catchings v. Hartman*, 174 So. 553 (Miss. 1937).  Bissette argues that the holding in *Catchings* was limited to deceased plaintiffs, not deceased defendants, and that *Catchings* broadened, rather than limited, those actions that survive.  However, *Catchings* clearly holds the contrary.

¶31.    In *Catchings,* the supreme court specifically held that slander does not survive the death of either the wrongdoer or the person injured.  *Id*. at 554.  To arrive at this conclusion, the court considered the 1930 code in place at the time which provided for the survival of some actions which read:

> When either of the parties to any personal action shall die before final judgment, the executor or administrator of such deceased party may prosecute or defend such action, and the court shall render judgment for or against the executor or administrator.

*Id*. at 553 (quoting Miss. Code Ann. §1714 (Rev. 1930)).  But the court pointed out that at common law, actions for slander do not survive the death of either party.  *Catchings,* 174 So. at 553. The question then was whether an action of slander was within the term "personal action" as used in the statute.  To answer this question, the court looked to *McNeely v. City*

---

[5] Executors, administrators, and temporary administrators may commence and prosecute any personal action whatever, at law or in equity, which the testator or intestate might have commenced and prosecuted. They shall also be liable to be sued in any court in any personal action which might have been maintained against the deceased. Miss. Code. Ann. § 91-7-233 (Rev. 2013).

*of Natchez*, 114 So. 484, 486 (Miss. 1927), which had held that the words of the statute "personal action," being contrary to common law, must be strictly construed. The 1930 Legislature was aware of the *McNeely* decision and could have changed the wording when it drafted the 1930 code. However, it did not and re-enacted the statute without change. The *Catchings* court then specifically found that "the action of slander is not a personal action within the strict interpretation of the statute." *Id*. at 554.

¶32. Bissette tries to limit *Catchings* to its facts, i.e. that the action was one brought on behalf of the slandered deceased. But *Catchings* and the statute clearly say that it applies to *both* the injured person and the wrongdoer, whoever is deceased. The holding in *Catchings* has not been overruled but actually cited subsequently without change. *See Caine v. Hardy*, 943 F.2d 1406, 1410 (5th Cir. 1991) ("The action of slander is not a personal action within the strict interpretation which the statute must now receive."), and *Mitchell v. Random House Inc.*, 703 F. Supp. 1250, 1255, n. 5 (S.D. Miss. 1988) (relying on *Catchings*), *aff'd*, 865 F.2d 664 (5th Cir. 1989). We see no reason on the facts of this case to revisit *Catchings*. Therefore, we hold that Bissette's slander claim against Woolverton was abated and extinguished upon Woolverton's death.

## CONCLUSION

¶33. For the above and foregoing reasons, we hereby affirm the circuit court's "Findings of Fact, Conclusions of Law, and Order of Dismissal" of Bissette's case.

¶34. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., NOT PARTICIPATING.**

18